Amy Wilkins Hoffman (SBN 022762)
Hoffman Legal, LLC
99 E. Virginia Ave., Ste. 220
Phoenix, AZ 85004
Phone: (623) 565-8851
Email: ahoffman@hoffmanlegalaz.com

John F. Baughman, *pro hac vice (pending)*
Adam Offenhartz, *pro hac vice (pending)*
Allison Melton, *pro hac vice (pending)*
Baughman Kroup Bosse PLLC
One Liberty Plaza—46th Floor
New York, NY 10006
Phone: (212) 548-3212
Email:  jbaughman@bkbfirm.com
Email: aoffenhartz@bkbfirm.com
Email: amelton@bkbfirm.com

Attorneys for Plaintiff Nikola Corporation

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nikola Corporation, | Case No.: |
| Plaintiff, | **VERIFIED COMPLAINT** |
| vs. | |
| EMBR Motors, Inc.; Trevor R. Milton; M&M Residual, LLC; Cole Cannon; and David "Dave" Sparks, | |
| Defendant(s). | |

Plaintiff Nikola Corporation ("Nikola"), for its Complaint against Defendants EMBR Motors, Inc., Trevor R. Milton, M&M Residual, LLC, Cole Cannon and David "Dave" Sparks, states as follows:

#701070v10

**PRELIMINARY STATEMENT**

1.      This action arises from an unlawful scheme by Defendants to commit tortious acts, breaches of contract, trademark infringement and securities law violations in furtherance of helping Trevor R. Milton ("Milton"), Nikola's disgraced founder and ex-CEO, regain *de facto* control of the company by nominating unqualified loyalists to Nikola's Board of Directors.

2.      Nikola is a public company with a $1.348 billion market cap.  It is a leader in clean energy technology, with a line of innovative electric trucks.  The company has a professional board of directors and a promising future—one that is possible only because of current management's success in leading Nikola to deliver groundbreaking products since Milton's dramatic departure over three and a half years ago.

3.      Milton's misconduct has been played out in the press and as part of a highly publicized criminal trial brought by the U.S. Department of Justice ("DOJ").  Milton's criminal trial highlighted his repeated false statements about Nikola's hydrogen production capabilities and technology.  For instance, Milton raved on various occasions not only about Nikola's ability to produce hydrogen, but that Nikola was producing hydrogen more cheaply than anyone else in the world.  At the time, Nikola did not produce any hydrogen.  In another example, Milton incorrectly claimed that Nikola had more than a billion dollars' worth of orders for its trucks.  When Milton's misconduct was exposed in September 2020, he resigned from the company.

4.      Nikola rightly thought it had seen the last of Milton following his resignation.  Unfortunately, that turned out not to be.

5.      In late 2022, Milton was convicted of securities fraud and wire fraud.  In late 2023, he was sentenced to four years in prison for his criminal conduct.  He is currently not in prison but is out on $100 million bail pending his appeal.  Milton caused Nikola untold harm, not the least of which was cloaking a growing and innovative company of approximately 900 employees working on real technology and real products, under a cloud of doubt and suspicion.

6.      Instead of focusing on his legal troubles, Milton has concocted a scheme with longtime friends David "HeavyD" Sparks ("Sparks"), a social media personality, and Cole Cannon ("Cannon"), an attorney, to try to regain control of Nikola.

7.      While corporate board takeover attempts are not, by themselves, unlawful, this one is because these Defendants have willfully and intentionally committed a number of wrongful acts, including violations of the securities laws, trademark infringement, multiple torts and multiple breaches of a contract between Nikola and Defendant EMBR Motors, Inc. ("EMBR").  That contract is known as the Asset Purchase Agreement (the "APA").

8.      In the APA, Nikola agreed to sell certain assets—primarily some prototypes for consumer-facing electric vehicles that would have required significant management attention and a billion dollar plus investment by an OEM to reach market—to a startup company called EMBR, owned and controlled by Defendants Sparks and Cannon.  Among Nikola's reasons for entering the APA was to further sever ties with Milton and to make sure that consumers and others would not mistakenly see a link between Nikola and EMBR (and Sparks and Cannon).  To that end, the APA expressly (i) prohibited Milton from being involved in any way with EMBR, (ii) prohibited EMBR from any use of Nikola's trade name and trademarks

Verified Complaint

in connection with the purchased assets and (iii) terminated a Development Agreement that Milton, while still at Nikola, had worked out with Sparks and Cannon.

9.      The parties to the APA recognized the importance of these provisions to Nikola. EMBR agreed that Nikola is entitled to injunctive relief and specific performance in order to "prevent breaches or threatened breaches" of the APA.  Despite this, EMBR breached the APA by publicly affiliating itself with Milton, flagrantly using Nikola's trade name and trademarks to garner attention, and allowing EMBR, the APA deal and the purchased assets to be used in furtherance of Milton's scheme to regain control of Nikola.

10.      There are four principal aspects to Milton's scheme to take over Nikola.

11.      *First*, Milton has recruited a slate of unqualified confederates to stand as candidates for Nikola's Board of Directors at the next annual meeting.  To advance the prospects of his slate, Milton has arranged for the filing of proxy soliciting materials with the SEC (the "Milton Proxy Contest").  These soliciting materials include false and misleading statements and fail to include certain material information in violation of the securities laws.

12.      *Second*, Milton has enlisted Sparks and Cannon to distribute at least one false and misleading video, as well as misleading social media posts, which include statements that misrepresent the relationship between Nikola, EMBR and the other Defendants.  The deception in these materials is so pervasive that there is already strong evidence of public confusion.  People posting on social media are uncertain as to Nikola's relationship to EMBR.

13.      For example, a February 18, 2024 YouTube video published by Sparks which purports to be announcing EMBR's purchase of assets in the APA mentions EMBR's name

Verified Complaint

only twice, buried several minutes into the video.  Meanwhile, the video mentions Nikola by name *over fifty times,* including in the video's title.

14.     *Third,* with Milton's encouragement, EMBR, Sparks and Cannon are willfully infringing Nikola's trademarks and misappropriating Nikola's brand recognition and goodwill in an effort to mislead stockholders and the public about the parties' relationships.

15.     As one example, the February 18, 2024 YouTube video repeatedly uses Nikola's name, displays Nikola's logo and appends the hashtags #nikola and #nikolabadger to affiliate the video with Nikola.

16.     Another particularly egregious example involves the EMBR website.  It prominently displays Nikola's name and logo and states, "Nikola is Back, under a new Brand . . . ."  That is completely false and EMBR made this statement without Nikola's authorization.

17.     *Fourth*, with Milton's encouragement, EMBR, Sparks and Cannon are breaching and tortiously interfering with key provisions of the APA prohibiting EMBR, Sparks and Cannon from working with Milton in any way with respect to EMBR.  Milton, Sparks and Cannon have placed EMBR front and center in their collective effort to take control of Nikola.  Sparks has posted repeatedly about both the pending insurgent proxy contest and the importance of the EMBR Badger to the future of Nikola once he, Milton and Cannon gain control of Nikola.  Such statements breach the APA's provisions prohibiting Milton from working with EMBR and also breach the various trademark and intellectual property restrictions in the APA.

18.     A full explanation of Milton's motive remains to be heard but he has two obvious incentives.  *First*, Milton apparently seeks to argue in the court of public opinion that

he is somehow the victim: that his criminal conviction is somehow just a misunderstanding and that everything he did was in the best interests of the company.  That is, of course, nonsense.

19.    *Second*, and more insidiously, Milton seeks control of Nikola for his own financial gain.  Shortly before he launched his proxy fight, Nikola obtained a $165 million arbitration award against Milton.  If he is able to regain control of the company Milton will undoubtedly attempt to undermine Nikola's efforts to collect the award against him.  There is no reasonable world in which that would be in the best interests of the company or its stockholders.

20.    The Defendants have acted unlawfully in connection with the Milton Proxy Contest.  Their disregard for securities laws, contractual obligations, the need for truthful public statements, Nikola's intellectual property, and what is best for the company and its stockholders is unlawful and should be enjoined by this Court.

## THE PARTIES

21.    Nikola is a Delaware corporation with its principal place of business in Phoenix, Arizona.  Nikola is an issuer of publicly traded securities.

22.    EMBR Motors, Inc. ("EMBR") is a Delaware corporation.  Upon information and belief, its principal place of business is in Arizona.

23.    Trevor R. Milton ("Milton") is an individual residing in Wyoming or Utah.

24.    M&M Residual, LLC ("M&M Residual" or "M&M") is a Nevada limited liability company owned and controlled by Milton.  M&M Residual's address of record is in Arizona.

Verified Complaint

25.     David "Dave" Sparks ("Sparks"), an individual residing in Utah, is a co-founder and the Chief Operating Officer (COO) of EMBR.

26.     Cole Cannon ("Cannon"), an individual residing in Arizona, is a co-founder and the Chief Executive Officer (CEO) of EMBR.  Cannon is a licensed attorney.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Complaint raises federal questions under (i) the federal Lanham Act, 15 U.S.C. §§ 1501, *et seq.* and (ii) Section 14(a) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78n(a) (the "Exchange Act") and 17 C.F.R. § 240.14a-9 ("SEC Rule 14a-9").

28.     As noted, and as described in detail below, in July 2023, EMBR and Nikola entered into an "Asset Purchase Agreement" (the "APA").  *See* **Exhibit A.**  The APA contains a forum selection clause providing that "any action, suit or proceeding with respect to any matter arising under or relating to this Agreement or the subject matter of this Agreement or any of the transactions contemplated by this Agreement" shall be brought "in the courts of competent jurisdictions located in Maricopa County, Arizona."  *See* Ex. A § 8.10.

29.     This action arises under and is related to the APA.  Accordingly, this Court has jurisdiction and venue is proper.

30.     Each of the Defendants has committed breaches of contract, tortious acts, trademark infringement and violations of securities laws within or directed towards the state of Arizona.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# THE FACTS

## A.    Nikola Is a Cutting-Edge Electric Vehicle Manufacturer

31.    Plaintiff Nikola is a leading designer and manufacturer of cutting-edge electric heavy-duty vehicles and clean energy solutions.  It is a publicly traded company with its headquarters and manufacturing facilities in Arizona.  Nikola's mission is to transform the commercial trucking industry by pioneering clean energy solutions for a zero-emissions world.

32.    In late 2023, Nikola, with the aid of its dedicated employees, delivered the first production hydrogen fuel cell electric truck available in North America, intended for heavy-duty commercial use.  Nikola anticipates delivering up to 350 more of these trucks in 2024.

33.    Through its HYLA brand, Nikola is also working on establishing a network of hydrogen fueling stations for commercial trucks throughout the United States and Canada. The company recently opened its first hydrogen fueling station in California.

## B.    Nikola Is Led by an Experienced Board of Directors

34.    Nikola's President and CEO, Steve Girsky, has more than thirty years of experience as a corporate executive, including several years in high-level roles at General Motors Corporation.  He has served on the boards of directors of multiple well-known publicly traded companies, including General Motors Corporation and U.S. Steel.  Girsky received an MBA from Harvard Business School.

35.    Nikola's Board of Directors (the "Board") presently consists of nine experienced individuals, each of whom has a strong track record of overseeing large and

Verified Complaint

successful businesses or have subject matter expertise relevant to Nikola's clean-energy transportation products and services.

36.     In addition to Girsky, who also serves on the Board, Nikola's directors are:

a.     Chairman Steve Shindler, a former chief financial officer of Nextel Communications, Inc. who, as the CEO of a start-up wireless communications company, transformed it into a leading wireless provider with millions of subscribers.  Shindler earned an MBA from the Cornell SC Johnson School of Business.

b.     Mike Mansuetti, the president of Bosch's North America business operations who, as indicated by his role leading a well-known multinational engineering and technology company, has years of experience holding executive leadership roles in engineering, manufacturing and management.

c.     Jonathan Pertchik, a former CEO and Managing Director of Fortune 500 publicly traded company TravelCenters of America, a business known for its nationwide network of fuel stations and truck stops which was recently acquired by BP.

d.     Mary Petrovich, who spent her formative years in manufacturing, engineering and financial leadership roles at companies like General Motors and Chrysler and is currently a senior executive for The Carlyle Group, a multinational private equity firm with $376 billion in assets under management. Petrovich earned an MBA from Harvard Business School.

e.     Bruce Smith, who has more than 30 years of experience leading manufacturing companies.  He is also the Chairman and CEO of Detroit Manufacturing Systems (DMS), a component manufacturer for global automotive brands with

approximately $1 billion in annual revenue.  Smith earned an MBA from Harvard Business School.

f.    Carla Tully, who has two decades of energy and infrastructure experience and is the co-founder and CEO of Earthrise Energy, a company focused on developing and implementing new, low-cost, environmentally friendly renewable energy solutions using existing infrastructure.  Tully earned an MBA from Columbia Business School.

g.    John Vesco, who has more than three decades of executive leadership experience within prominent transportation and supply chain organizations and currently teaches university courses in supply chain, leadership and operations management.

h.    Andrew Vesey, a former chief executive and president of Pacific Gas and Electric Company ("PG&E"), who has more than 40 years of diverse utility industry experience.  Vesey holds a master's degree in applied science from New York University.

**C.    Nikola's Founder and Former CEO, Trevor Milton, is a Convicted Felon**

37.    In October 2022, Nikola's founder and former CEO, Trevor Milton, was convicted of one count of securities fraud and two counts of wire fraud following a jury trial in the U.S. District Court for the Southern District of New York.

38.    In December 2023, Milton was sentenced to prison for four years, fined $1 million and ordered to forfeit a 4,700-acre property in Utah known as Wasatch Creeks Ranch.

The final judgment in Milton's criminal case was entered on January 17, 2024.[1]  The amount and details of a Restitution Order against Milton are nonetheless still being litigated.  This Restitution Order could well require Milton to pay tens if not hundreds of millions of dollars.

39.     Milton is not yet imprisoned but is currently out on $100 million bail pending the appeal of his felony convictions.

40.     Milton's felony convictions resulted from false and misleading statements about Nikola's products and technology development.  For instance, the DOJ alleged that Milton had made false and misleading claims about the development of a consumer-focused electric- and hydrogen-powered pickup truck known as the "Badger," indicating that the development of the Badger truck was much further along than it was.

**D.  In 2020, Nikola Had a Bright Future**

41.     Despite the company being led by Milton, a person willing to bend the truth and fabricate "facts," Nikola was nonetheless working on cutting-edge products and concepts—zero emission, clean-energy vehicles—that were unique, real, exciting and garnered the attention of the media and potential investors.

42.     On June 4, 2020, Nikola became a publicly traded company.

43.     Thereafter, Milton stepped down as CEO but became the Executive Chairman of Nikola's Board and remained the public face of the company, its largest shareholder and its *de facto* leader.

---

[1]  Judgment in a Criminal Case, *United States v. Milton*, No. 1:21-cr-00478 (S.D.N.Y. Jan. 17, 2024), ECF No. 327.

Verified Complaint

44.     A few months later, on September 8, 2020, General Motors Corporation ("GM") announced a strategic manufacturing partnership with Nikola.[2]   In exchange for helping Nikola engineer and build the Badger truck and other services, including supplying key parts for the vehicles, GM was to receive a significant equity stake in Nikola.

45.     In response to the deal with GM, Nikola's stock price went up by about 40% virtually overnight, going from $35.55 to about $50.00 per share.[3]

**E.     In September 2020, the Hindenburg Report Exposes Milton's Misconduct**

46.     Just two days later, on September 10, 2020, a third-party company called Hindenburg Research, aided by third-party whistleblowers, published a short-seller report intending to expose Milton's many false and misleading statements (the "Hindenburg Report").[4]

---

[2]  News Release, General Motors, *Nikola And General Motors Form Strategic Partnership; Nikola Badger To Be Engineered And Manufactured By General Motors* (Sept. 8, 2020), https://investor.gm.com/news-releases/news-release-details/nikola-and-general-motors-form-strategic-partnership-nikola.

[3]  On September 4, 2020, Yahoo! Finance listed the closing share price for Nikola (NKLA) stock as $35.55 per share.  On September 8, 2020, the next day the market was open, Yahoo! Finance listed the closing price for Nikola stock as $50.05 per share.  *See https://finance.yahoo.com/quote/NKLA/history?period1=1599177600&period2=1599782400*.

[4]  Hindenburg Research*, Nikola: How to Parlay an Ocean of Lies into a Partnership With the Largest Auto OEM in America* (Sept. 10, 2020), https://hindenburgresearch.com/nikola/.

Verified Complaint

47.     Nikola's stock price nosedived.  By the end of September 2020, its stock price had dropped to below $18.00 per share.[5]  GM significantly scaled back its relationship with Nikola.

48.     Lawsuits and governmental investigations quickly followed.

49.     For example, on July 29, 2021, the U.S. Securities and Exchange Commission ("SEC") announced charges against Milton "for repeatedly disseminating false and misleading information—typically by speaking directly to investors through social media—about Nikola's products and technological accomplishments."[6]  This case is still pending.

50.     Nikola also continues to defend actions brought by stockholders against both Nikola and Milton asserting claims based on Milton's false statements when he was at the company.

51.     Milton is named as a defendant in several active lawsuits.

52.     There is also ongoing litigation directly between Nikola and Milton related to Milton's misconduct.  For example, Nikola settled certain SEC claims against it by paying a fine of $125 million.  Nikola sought to recover this settlement payment and additional damages though an arbitration against Milton.  On October 20, 2023, Milton was found liable

---

[5]  On September 29, 2020, Yahoo! Finance listed the closing share price for Nikola (NKLA) stock as $17.88 per share.  *See* https://finance.yahoo.com/quote/NKLA/history?period1=1601337600&period2=1601424000.

[6]  Compl., ECF No. 1, SEC v. Milton, No. 21-06455 (S.D.N.Y. July 7, 2021); *see also* U.S. Securities and Exchange Commission, *SEC Charges Founder of Nikola Corp. With Fraud* (July 29, 2021) https://www.sec.gov/news/press-release/2021-141.

in this arbitration, resulting in an award to Nikola of $165 million plus interest (the "Arbitration Award"). This award remains unpaid and Nikola is vigorously pursuing all legal avenues to recover monies owed to Nikola by Milton.

### F.   Ten Days After the Hindenburg Report, Milton Resigns

53.   On September 20, 2020, ten days after the Hindenburg Report was published, Milton resigned as the Executive Chairman of the Board.[7]

54.   Girsky, already a member of Nikola's Board, was appointed Chairman of the Board effective immediately.

55.   In connection with his departure from Nikola, Milton signed a separation agreement with Nikola (the "Separation Agreement").[8]  In that contract, Milton agreed that for a three-year standstill period after his departure (*i.e.*, until September 20, 2023) he would not acquire ownership (beneficial or otherwise) of more than 19 million shares of Nikola common stock and would not participate in any solicitation of proxies or consents related to the election or removal of Nikola directors, including any "withhold," "vote no" or similar campaign.

56.   Notwithstanding his departure, Milton retained beneficial ownership of stock in Nikola, holding it through one or more limited liability companies owned and controlled by Milton, including Defendant M&M Residual.

---

[7]   Nikola Corp., Current Report (Form 8-K) (Sept. 20, 2020).

[8]   *Id.* Ex. 10.1.

Verified Complaint

57.     In a letter to Nikola dated January 26, 2024, and in a subsequent Schedule 14A filing discussed further below, Milton asserted he was the beneficial owner of approximately 52 million shares of Nikola common stock.

**G.      Right Before Leaving, Milton Causes Nikola to Enter into a Development Agreement with Sparks' Production Company**

58.     On September 17, 2020, just three days before his departure, Milton spearheaded a Development Agreement between Nikola and Atlas Production Company, LLC ("Atlas Production" or "Atlas").

59.     Atlas Production is and was a Utah limited liability company founded by Defendants Sparks and Cannon on March 15, 2019, as a vehicle to facilitate Sparks' marketing and promotional activities.

60.     In the Development Agreement, Atlas agreed to promote the Badger truck in exchange for stock in Nikola, such that if the project were successful, it would be extremely lucrative for Atlas' principals, Sparks and Cannon.  Potentially, Atlas could have obtained up to 2 million shares of Nikola stock.

61.     Sparks is a 39-year-old reality TV personality and social media influencer also known as "HeavyD" who gained notoriety as one of the "Diesel Brothers" on a Discovery Channel show by the same name.  The TV show follows Sparks and others "as they build big, bad trucks, pull elaborate pranks and push the limits with new stunts."

Verified Complaint

62.     Sparks also has a strong presence on social media, including a YouTube channel which has over 3.5 million followers and 776 million views, as well as an Instagram account with 3.6 million followers:





63.     Sparks owns and manages several small business ventures including but not limited to: Atlas Production (a marketing company, as noted above); B&W Auto LLC d/b/a Sparks Motors, LLC ("Sparks Motors"), a company that generates income by selling custom vehicles, generating social media content and selling branded t-shirts and apparel online; Dieselsellerz.com LLC (d/b/a Dieselsellerz), an online marketplace for selling diesel trucks; and EMBR, a startup company discussed more fully herein.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**H.    Sparks Is No Stranger to Litigation**

**i.    The Rolling Coal Litigation**

64.    Sparks is notorious for "rolling coal," the practice of modifying a diesel engine to intentionally emit large amounts of black or gray sooty exhaust fumes.

65.    "Rolling coal" is often done as a form of anti-environmental protest or antagonism.  For example, Wikipedia notes, "[s]ome drivers intentionally trigger coal rolling in the presence of hybrid vehicles (a practice nicknamed 'Prius repellent') to cause their drivers to lose sight of the road and inhale harmful air pollution."[9]

66.    Sparks became so well known for "rolling coal" that in 2017 he was sued by a nonprofit group of Utah physicians for violations of the federal Clean Air Act and Utah state law for tampering with vehicle emission control devices and selling devices to bypass emission controls to other air pollution enthusiasts (the "Rolling Coal Lawsuit").

67.    The defendants, including both Sparks and his company Sparks Motors, lost the Rolling Coal Lawsuit, resulting in a money judgment against them of more than $1.2 million (including more than $840,000 in attorneys' fees and costs payable to the plaintiff and over $390,000 in fines payable to the United States and a county in Utah), as well as an injunction barring Sparks and his co-defendants from tampering with emission control devices and

---

[9]    *Wikipedia,* "Rolling coal," https://en.wikipedia.org/wiki/Rolling_coal (accessed Mar. 7, 2024).

Verified Complaint

owning or operating vehicles with disabled emission control systems, among other restrictions.[10]

68.     The Tenth Circuit, while limiting damages to the defendants' wrongful actions in Utah and remanding the case to the district court for further rulings, did note the "flagrant misconduct" of defendants in removing emission controls.[11]

69.     The Rolling Coal Lawsuit is not yet over because Sparks and his co-defendants have been unable to pay the money they owe.

70.     Sparks' filings in the Rolling Coal Lawsuit confirm that Sparks, and his businesses, are experiencing serious financial problems.

71.     For example, on August 19, 2020, Sparks filed a declaration in the Rolling Coal Lawsuit painting a "disastrous" financial picture: his businesses were failing or unprofitable, he had incurred tax liens and penalties of over $331,000 and was even facing impending foreclosure on his home.  *See* **Exhibit B**.

72.     As recently as February 5, 2024, Sparks again reiterated, under oath, that he lacks the financial resources to satisfy the Rolling Coal Lawsuit judgment in part because his business ventures were not profitable or had failed.  *See* **Exhibit C**.

73.     Cannon and his law firm represent the defendants, including Sparks, in the Rolling Coal Lawsuit.

---

[10]   Am. J., Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC, No. 2:17-cv-00032 (D. Utah Jan 19, 2024), ECF No. 318.

[11]   *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1259 (10th Cir. 2021).

Verified Complaint

74.     On January 22, 2024, the judge in the Rolling Coal Lawsuit even issued an order requiring Cannon's law firm to show cause why the court should not impose sanctions under Federal Rule of Civil Procedure 11 for making contradictory representations to the court in various filings.  In the show cause order, the judge expressed concern that "Cannon Law made these contradictory representations to obstruct [plaintiff] from collecting on the Judgment and to assist their clients in evading contempt charges."

75.     On March 2, 2024, the plaintiff in the Rolling Coal Lawsuit filed a motion asking that court to enjoin Sparks' companies from distributing any funds or assets to Sparks until his $843,602.23 debt to the plaintiff for its attorneys' fees and costs is paid in full.[12]  The plaintiff's motion and the outcome of the show cause order are still pending.

### ii.     Diesel Trademark Lawsuit

76.     In addition to the Rolling Coal Lawsuit, in 2019 one of Sparks' companies, Diesel Power Gear LLC, was sued for trademark infringement, trademark dilution and federal unfair competition by Diesel S.p.A. and Diesel USA, an apparel company which makes jeans and other clothing (the "Diesel Trademark Lawsuit").[13]

77.     Sparks' company lost the Diesel Trademark Lawsuit too.  A federal court in New York granted the plaintiffs' motion for partial summary judgment and awarded them over $11 million in damages.  On December 11, 2023, the court permanently enjoined Sparks

---

[12]  Pl.'s Mot. for Writ of Execution Application for Charging Order and Mem. in Support, Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC, No. 2:17-cv-00032 (D. Utah Mar. 2, 2024), ECF No. 327.

[13]  Compl., Diesel S.p.A v. Diesel Power Gear, LLC, No. 1:19-cv-09308 (S.D.N.Y. Oct 8, 2019), ECF No. 1.

and others affiliated with Diesel Power Gear LLC from marketing and selling products using any of the plaintiffs' trademarks or any marks that are confusingly similar to them.[14]

### iii.   Hemlock Hat Trademark Lawsuit

78.     Nor was that the only incident of trademark infringement by Sparks' companies. In December 2020, Diesel Power Gear LLC was sued by Hemlock Hat Company for trademark infringement and false advertising (the "Hemlock Hat Trademark Lawsuit").[15]  The pleadings alleged that Diesel Power Gear LLC and Sparks (via his social media accounts) were advertising and selling a straw hat with a unique American flag design that was indistinguishable from the plaintiff's trademarked hat design.  The lawsuit was eventually settled, with the settlement including a stipulated permanent injunction prohibiting Diesel Power Gear LLC and any of its agents or employees from further infringement of the plaintiff's intellectual property rights.  Diesel Power Gear LLC was represented by Cannon and his law firm in the Hemlock Hat Trademark Lawsuit.

### iv.   Copyright Infringement Claim

79.     Sparks and his companies have also been sued for copyright infringement.  In October 2021, a mural artist named Shae Petersen sued Diesel Power Gear LLC, Sparks and others for using copyrighted material for marketing purposes on Diesel Power Gear LLC's

---

[14]   Permanent Inj. Order and Final J., Diesel S.p.A v. Diesel Power Gear, LLC, No. 1:19-cv-09308 (S.D.N.Y. Dec. 11, 2023), ECF No. 123.

[15]   Am. Compl., Hemlock Hat Co., Inc. v. Diesel Power Gear, LLC, No. 3:19-cv-02422 (S.D. Cal. Dec. 16, 2020), ECF No. 19.

Verified Complaint

social media accounts.[16]   The case was settled for an undisclosed amount after the plaintiff was granted partial summary judgment against Sparks and others for copyright infringement.

**I.      Sparks' Relationship with Trevor Milton**

80.      The 2020 Development Agreement between Nikola and Atlas Production was not an arm's length transaction.

81.      Sparks is and was, in his own words, a "longtime friend" of Milton.   Upon information and belief, they have known each other for over 15 years.

82.      Sparks and Milton have a history of collaborating to further each other's business and personal interests.

83.      As already noted, the Development Agreement with Atlas Production (Sparks' company) was negotiated and finalized on September 17, 2020.  This was just one month after Sparks claimed insolvency in the Rolling Coal Lawsuit, a week after the Hindenburg Report had been released and three days before Milton's departure from Nikola.

84.      Milton, on his way out the door of Nikola, after being accused of rampant misconduct, gave his good friend Sparks a toehold in the company as a contract partner of Nikola.

85.      This also gave Sparks an opportunity to try to counteract the negative publicity he had received from the Rolling Coal Lawsuit by becoming involved with an environmentally friendly company.

---

[16]   Compl., Petersen v. Diesel Power Gear, LLC, No. 1:21-cv-0882 (S.D.N.Y. Oct. 28, 2021), ECF No. 1.

Verified Complaint

86.     Indeed, Sparks immediately began flaunting his new relationship with Nikola on social media to mitigate the negative publicity he had received from the Rolling Coal Lawsuit.[17]

87.     Sparks also has a history of using his notoriety and social media clout to help Milton.

88.     For example, in August 2022—while Milton was preparing for his criminal trial—Sparks published a YouTube video of himself touring and fawning over one of Milton's opulent real estate holdings, an estate near Park City, Utah.[18]

89.     It was clear the video was an advertisement for Milton's property, as it showed Sparks expressing amazement at all the features of the property, discussing them in detail, while the text below the YouTube video included hyperlinks links to the real estate agent's property listing and contact information.

**J.     Sparks' Relationship with Cannon**

90.     Defendant Cole Cannon is a 42-year-old serial entrepreneur with a law practice, who—in his own words—prioritizes business over the law and views the law as "a means to achieve his clients' business needs."[19]

---

[17]  Peter Holderith, *The Diesel Brothers Are Now Shilling for the Nikola Badger, an Electric Pickup That Doesn't Exist* (Sept. 18, 2020), https://www.thedrive.com/news/36541/the-diesel-brothers-are-now-shilling-for-the-nikola-badger-an-electric-pickup-that-doesnt-exist.

[18]  HeavyDSparks, *We Found a $26 Million Dollar Totally Off-Grid Mansion- Let's Go Inside*, YouTube (Aug. 1, 2022), https://www.youtube.com/watch?v=__kvM5tvlw0.

[19]  *Cole S. Cannon — Cannon Law Group, PLLC, Cannon Law Group, PLLC* (Mar. 7, 2008), https://www.cannonlawgroup.com/cole-cannon.

91.     Aside from his law practice, which operates out of Salt Lake City, Utah, Cannon is involved in various entrepreneurial business ventures.

92.     Sparks and Cannon also have known each other for approximately a decade, if not longer.  Sparks describes Cannon as a "close friend."

93.     In addition to their longstanding personal relationship, Cannon has regularly represented Sparks and his companies in various legal proceedings.

94.     For example, Cannon represented the defendants, including Sparks and Sparks Motors, in the Rolling Coal Lawsuit.

95.     Cannon also negotiated the Development Agreement on behalf of Atlas in 2020.

**K.     Nikola Rebuilds After Milton's Departure**

96.     Despite Milton's lies and criminal prosecution – and the accompanying negative publicity – Nikola's Board and executives, once unshackled from Milton, began focusing on rebuilding the company and regaining the trust of investors and the public.

97.     In November 2020, Nikola's Board and executives decided to narrowly focus on developing electric and hydrogen-fueled trucks for heavy-duty commercial use.

98.     As part of that plan, Nikola decided to stop working on its consumer-oriented projects, including the Badger truck and recreational vehicles like Waverunners and UTVs (utility terrain vehicles).

99.     These consumer-oriented projects would require significant management attention and an OEM (original equipment manufacturer) partner willing to spend a billion dollars or more to bring the projects to market.

100.   In 2021, Sparks and Cannon expressed an interest in buying the Badger truck and recreational vehicle projects (collectively, the "Powersports Assets") and began negotiating with Nikola.

101.   As described further below, Nikola would consider selling the Powersports Assets, but it had two fundamental non-negotiable conditions: (i) Milton could not have anything to do with EMBR and those assets, and (ii) EMBR was prohibited from referring to, or making use of, any trade names and trademarks retained by Nikola under the APA (effectively all of Nikola's branding, trade names, trademarks and intellectual property, other than that of the Powersports Assets transferred to EMBR.)

**L.     Nikola and EMBR Agree to the Asset Purchase Agreement**

102.   On July 19, 2023, Sparks and Cannon formed a new Delaware corporation, Defendant EMBR, to purchase the Powersports Assets from Nikola.

103.   At the time of its formation, Atlas Production owned 100% of the shares in EMBR.  Cannon and Sparks, in turn, managed and were the beneficial owners of Atlas Production.

104.   Cannon was also named the CEO of EMBR, while Sparks was named COO.

105.   A few days later, on July 21, 2023, Nikola and EMBR entered into the APA.

106.   As memorialized in the APA, Nikola sold EMBR certain powersports assets, including the prototypes, contract rights and intellectual property related to the development of the consumer-focused Badger truck and other consumer-focused recreational vehicles. These assets are more fully described in the APA as the "Purchased Assets." Ex. A § 2.1.

Verified Complaint

107.   In exchange for those assets, as more fully described in the APA, EMBR executed a $15 million promissory note and security instrument in favor of Nikola and granted Nikola 4,285,714 shares of EMBR common stock (*i.e.*, a 30% stake in EMBR) and other consideration.  Ex. A § 3.1.

108.   The APA prohibited Nikola from publicly announcing the deal.  Ex. A § 6.5(a). This was a deal point demanded by EMBR, although they did not fully explain their rationale at the time.  Recent events reveal that it was part of their plan to get control of Nikola.

109.   During negotiations of the APA, Nikola was aware that Sparks and Cannon had a personal relationship with Milton.  This was not a secret.  Milton had introduced Sparks and Cannon to others at Nikola at least as early as 2020.  Indeed, as far back as January 2020, Cannon stated that he and Sparks shared "a vision" with Milton and that they were in "total alignment."

110.   Nikola had no desire for any further involvement with Milton given his felony convictions and the significant financial and reputational damage he had already caused Nikola to suffer.

111.   Nikola made clear its desire to be rid of Milton.  Indeed, in February 2024, Cannon conceded in a message to a Nikola executive: "You were clear.  You didn't want to work with Trevor [Milton].  I get it.  Noted 100%."

112.   Thus, key terms of the APA were drafted to reflect Nikola's intent to keep all ties with Milton severed and to remove Nikola's name from the Badger truck project.

113.   *First*, a condition of the asset sale was the termination of the Development Agreement with Atlas Production, *i.e.*, the agreement that Milton had prompted Nikola to

enter into with Sparks' company three days before Milton departed from Nikola.  The termination of this Development Agreement was treated, in the APA, as additional consideration being given by Atlas Production to Nikola for the sale.  *See* Ex. A § 3.1.

114.  *Second*, Nikola insisted that Milton could not, either directly or indirectly, have any involvement with EMBR or the Purchased Assets, including the Badger truck.  Sparks and Cannon, participants in the negotiations, acknowledged and agreed to this stipulation.

115.  Thus, EMBR represented, warranted and agreed, in a section of the APA entitled "Excluded Individual," that:

> Trevor R. Milton is not, and will not for the Restricted Period be, involved, in any manner, directly or indirectly (including advising Purchaser in any way, owning, managing, operating, joining, controlling, being employed by, or participating in the ownership, management, operation or control of, or **being connected in any manner with Purchaser or the Purchased Assets**, including, without limitation, holding any position as a stockholder, director, officer, consultant, independent contractor, employee, partner, or investor in Purchaser) with Purchaser or the business of Purchaser following the Closing.

Ex. A § 5.5 (hereafter, the "Excluded Individual Clause") (emphasis added).

116.  Third, the APA made it clear, repeatedly, that Nikola's name, trademarks and branding could not be used by EMBR going forward and were not being conveyed as part of the sale:

> Purchaser acknowledges that notwithstanding anything to the contrary herein, no right, express or implied, is granted by this Agreement to use **in any manner** any trade name or trademark of [Nikola], other than those trademarks included in the Purchased Assets, in connection with the performance of this Agreement, the exploitation of any license granted hereunder, or in any connection with the Business or Purchased Assets, and

**Purchaser agrees not to use any trade name or trademark of [Nikola] in violation of the foregoing**.

Notwithstanding anything to the contrary herein, **no right, express or implied, is granted by this Agreement to use in any manner any trade name or trademark of [Nikola],** other than those trademarks included in the Purchased Assets, in connection with the performance of this Agreement, the exploitation of any license granted hereunder, or in any connection with the Business or Purchased Assets.

Ex. A §§ 4.15(m), 5.5 and 6.2 (emphasis added) (collectively, the "Trademark Clauses").

117. It was further agreed that any breach or threatened breach of the APA would constitute irreparable harm to Nikola. Specifically, EMBR (as Purchaser) acknowledged and agreed that:

…in the event of any breach or threatened breach by Purchaser of its covenants or obligations set forth in this Agreement, Seller will be entitled to an injunction or injunctions to prevent or restrain breaches or threatened breaches of this Agreement by Purchaser, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of Purchaser under this Agreement, in addition to any other remedy to which Seller is entitled at law or in equity, including Seller's right to terminate this Agreement and to seek money damages.

Ex. A § 8.4.

118. At the conclusion of the sale transaction contemplated in the APA, in July 2023, Atlas owned 70% of the outstanding shares of common stock in EMBR, while Nikola owned the remaining 30% of the shares.

119. Atlas Production, the majority stockholder in EMBR, continues to be owned and managed by Sparks and Cannon.

120.   Despite his proclivity for posting on social media, Sparks was uncharacteristically silent about the founding of EMBR and the deal struck in the APA.  So was Cannon.  No public mention of EMBR or the APA was made for several months after the deal closed.

121.   In fact, Sparks actively concealed EMBR's existence and his involvement in it despite having no legal duty to do so.  While giving sworn testimony in the Rolling Coal Lawsuit in August 2023, about a month after EMBR's formation and the APA had been finalized, Sparks was asked to identify all of the businesses in which he was involved and failed to mention or disclose his recent ownership of EMBR.[20]

## M.   Milton, Sparks and Cannon Launch a Scheme to Use EMBR and the APA Transaction to Help Milton Regain Control of Nikola

122.   On an unknown date prior to January 26, 2024, Milton, Cannon, Sparks and other individuals whose identities and level of involvement are currently unknown (the "Unknown Conspirators") agreed to participate in a scheme to take control of Nikola's Board of Directors by nominating five new directors to the Board (*i.e.*, a majority of the nine-member Board) who would be loyal to Milton and could vote in Board meetings in furtherance of Milton's goals and interests.

123.   In furtherance of their scheme, Milton, Cannon, Sparks and the Unknown Conspirators unlawfully agreed to use EMBR, M&M Residual, the APA, Nikola's sale of the Purchased Assets to EMBR, the Badger truck and Nikola's trade name, trademarks, reputation

---

[20]   Tr. of Suppl. Proceedings on Aug. 24, 2023, Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC, No. 2:17-cv-00032 (D. Utah Mar. 2, 2024), ECF No. 327-1.

Verified Complaint

and goodwill in order to draw public attention to, and thus garner shareholder votes for, their attempted takeover of Nikola's Board.

124.   Milton had much to gain if the scheme was successful: not only could he regain *de facto* control of the company he founded before his criminal conviction, he could use that power to exact revenge on anyone he felt was responsible for his well-publicized downfall and gain further wealth.  As another example, he could potentially have his appointees on the Board direct Nikola's legal department to stop all efforts by the company to collect the $165 million Arbitration Award it had obtained against him.

125.   Cannon and Sparks also had much to gain from the scheme because, without Nikola's name and brand recognition attached to them, the assets they had just purchased from Nikola for $15 million in seller financing—essentially ideas, intellectual property and prototypes that were far from market-ready—were of little immediate value.  Using EMBR and its purchase of the Badger truck in furtherance of an attempted takeover of Nikola's Board, while simultaneously announcing EMBR's existence and its purchase of the Badger truck product for the first time, would launch their new company in the most dramatic and public way possible, ensuring an extraordinary amount of attention from the media, the public and potential investors.  Were they to become directors of a public company, Sparks, Cannon and Milton's other nominees could award themselves significant compensation through board fees and equity awards.

**N.    Milton, Sparks and Cannon Launch Their Takeover Attempt**

126.   On January 26, 2024, M&M Residual, a company owned and controlled by Trevor Milton whose primary purpose is to hold Milton's Nikola stock, sent Nikola notice of

intent to nominate five new directors to Nikola's Board at Nikola's 2024 Annual Meeting (the "Jan. 26 Notice").  *See* **Exhibit D**.

127.    The Jan. 26 Notice was sent in furtherance of the scheme between Milton, Cannon, Sparks and the Unknown Conspirators to take control of Nikola.

128.    The dissident nominees identified in Milton and M&M Residual's Jan. 26 Notice were Sparks and Cannon along with three other individuals who also had prior relationships with Milton, Sparks or Cannon: Derek Johnson; Hans Peterson; and Paul Southam (collectively the "M&M Nominees").

129.    Peterson is a longtime employee of Sparks Motors, a company owned by Sparks.  Sparks has called Peterson his "partner" in Sparks Motors.

130.    Johnson is a very close friend of Milton who has known him for several years. Johnson and his family even traveled to New York to support Milton during his criminal trial. Johnson also submitted a letter to the court during Milton's sentencing, hoping to help Milton secure a more lenient sentence for his felony fraud convictions.   Johnson is the founder of Cowboy Up, LLC, a purported business consultancy.  Before that venture, Johnson managed a doughnut shop with his father-in-law and was a Route Manager at Western Wyoming Beverages Inc., a beverage distributor.

131.    Southam is a longtime client of Cannon and his law firm.

132.    As noted, Sparks and Cannon—two of the M&M Nominees—were the co-founders of EMBR.

133.    As of January 26, 2024, Sparks was the COO of EMBR and Cannon was its CEO.  Together, they controlled, and continue to control, EMBR.

- 30 -

Verified Complaint

134.    Each of the M&M Nominees confirmed, in writing, their consent to the nomination, indicating that they had made a knowing and willful decision to participate.

135.    There is no question that Milton and the M&M Nominees are working together. As confirmed in a later SEC filing (on February 20, 2024) the M&M Nominees were identified as being part of a "Group."

136.    Nikola rejected Milton's slate of nominees on February 9, 2024.  Milton and his slate will now seek election to the Board at Nikola's next stockholder meeting.

**O.    EMBR Breaches the APA**

137.    On February 18, 2024, Sparks published a 25-minute video on YouTube entitled "The Nikola Badger is REAL and I Own Them," which he called "the biggest announcement of [his] entire career." (the "Feb. 18 Video").[21]

138.    The Feb. 18 Video was conceived, created and published in furtherance of the aforementioned scheme between Milton, Cannon, Sparks and the Unknown Conspirators.

139.    Sparks reposted or linked to the Feb. 18 Video on his other social media accounts (*e.g.*, TikTok and Instagram) to ensure the broadest audience possible.

140.    In the Feb. 18 Video, Sparks:

- Announces, for the first time, the formation of EMBR and its purchase of the Badger truck and other assets formerly belonging to Nikola;

- Shows footage of various vehicles bearing Nikola's trade name and marks;

---

[21]    HeavyDSparks, *The Nikola Badger is REAL and I Own Them*, YouTube (Feb. 18, 2024), https://www.youtube.com/watch?v=Fl8L3kWCpFQ.

Verified Complaint

- Implies that the formation of EMBR and the APA with Nikola was a recent occurrence;

- Describes the terms of the APA;

- Introduces Cannon, and bestows a number of compliments on him, calling him a "wizard" for getting the APA deal done with Nikola and displaying a photo of Cannon and Sparks;

- Includes ample footage, designed to look appealing, of the Badger truck prototypes; and

- Engages in a detailed discussion of the Badger truck, describing all of its features and EMBR's plans to develop and sell them.

141.    Yet in the very same Feb. 18 Video announcing EMBR's existence and its purchase of the Badger truck project, Sparks also:

- Discusses his "good friend" Milton's criminal conviction and suggests that Milton may have been wrongfully convicted;

- Directs the viewer's attention to a post on an individual's website suggesting that Milton's criminal trial was mishandled;

- Discusses Milton and M&M's attempt to take over the Nikola Board;

- Mentions that he, Sparks, has been nominated to serve on Nikola's Board;

- Uses the platform to advocate for the M&M Nominees while disparaging Nikola's current management;

- Promises that additional videos will be forthcoming soon;

- Refers repeatedly to Nikola and its products, including improperly displaying Nikola trademarks; and

- Admits that "[o]ur goal is to be able to get myself and a few other people on the [Nikola] board who are ambitious . . . and ready to bring Nikola back to its former glory. . ." by "developing cool projects and doing what the company originally set out to do in the beginning. . . ."

Verified Complaint

142.    In the Feb. 18 Video, Sparks also announces that he is working with Milton and Cannon to try to take over the Nikola Board, mentioning both men by name, displaying their photos and explaining that "*[o]ur goal* is to be able to get myself and a few other people on the board who are ambitious and excited and ready to make those changes and ready to bring Nikola back to its former glory…," referencing the time when Milton controlled the company. Sparks also states that, if elected to the Board, he would direct the company to do "what the company originally set out to do in the beginning", *i.e.*, when Milton was in charge.

143.    There is also a text post with hyperlinks appearing immediately below the Feb. 18 Video on YouTube.

144.    The first paragraph of the text below the Feb. 18 Video discusses the Purchased Assets and the APA:

> This announcement has been a very LONG time in the works and the day is finally here for me to announce that we have purchased all of the rights, assets, and everything connected to the **Nikola** Badger, UTV, and Waverunner products. We will be releasing many more videos soon to answer all of your questions.

(emphasis added).

145.    Immediately below that announcement, the second paragraph says: "Here is the link to the document 'When the Jury Gets it Wrong' I referenced" and supplies a hyperlink to a website post suggesting that Milton's criminal trial was mishandled (https://jessicareedkraus.substack.com).  The hyperlinked website is run by a single individual and describes itself as "[w]here pop culture deep dives mingle with quality conspiracy theories, lifestyle highlights, and trending water cooler gossip."

146.  The third paragraph of the text includes a hyperlink to a website apparently created and controlled by M&M and/or Milton, https://www.mmnkladisclaimer.com/ (the "M&M Disclaimer Website") and a copy of the same text that is displayed on the linked website (hereafter, the "M&M Disclaimer Text"):

> M&M Residual, LLC, a Nevada limited liability company ("M&M Residual"), together with the other participants named herein (collectively, the "Concerned Stockholders"), intend to file a preliminary proxy statement and accompanying universal proxy card with the Securities and Exchange Commission (the "SEC") to be used to solicit votes for the election of its slate of director nominees at the 2024 annual meeting of stockholders of Nikola Corporation, a Delaware corporation (the "Company").
>
> THE CONCERNED STOCKHOLDERS STRONGLY ADVISE ALL STOCKHOLDERS OF THE COMPANY TO READ THE PROXY STATEMENT AND OTHER PROXY MATERIALS AS THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION. SUCH PROXY MATERIALS WILL BE AVAILABLE AT NO CHARGE ON THE SEC'S WEBSITE AT HTTP://WWW.SEC.GOV. IN ADDITION, THE PARTICIPANTS IN THIS PROXY SOLICITATION WILL PROVIDE COPIES OF THE PROXY STATEMENT WITHOUT CHARGE, WHEN AVAILABLE, UPON REQUEST. REQUESTS FOR COPIES SHOULD BE DIRECTED TO THE PARTICIPANTS' PROXY SOLICITOR.
>
> The participants in the proxy solicitation are anticipated to be M&M Residual, Trevor R. Milton, Cole Cannon, Derek Johnson, Hans Peterson, Paul Southam, and Dave Sparks.
>
> As of the date hereof, M&M Residual directly owns 51,047,726 shares of common stock, par value $0.0001 per share, of the Company (the "Common Stock"). As of the date hereof, as the Manager of M&M Residual, Mr. Milton may be deemed to beneficially own the 51,047,726 shares of Common Stock directly owned by M&M Residual and Mr. Milton may be deemed to beneficially own the 1,250,000 shares of Common Stock directly owned by Mr. Milton's spouse, constituting an aggregate of 52,297,726 shares of Common Stock. As of the date

Verified Complaint

hereof, Mr. Peterson directly owns 71 shares of Common Stock. As of the date hereof, Mr. Sparks directly owns 164 shares of Common Stock. As of the date hereof, none of Messrs. Cannon, Johnson, or Southam own any shares of Common Stock.

147.     The Feb. 18 Video unabashedly uses the announcement of EMBR's purchase of the Badger truck project from Nikola to draw attention to and further Milton's interests, including trying to regain control of Nikola's Board.

148.     Upon information and belief, Sparks and Cannon worked directly or indirectly with Milton in the development, planning, production and/or creation of the Feb. 18 Video.

149.     The Feb. 18 Video includes multiple false and misleading statements.

150.     For example, the Feb. 18 Video implies that the APA deal with Nikola was only recently finalized and that Sparks was prohibited from talking about it, with Sparks saying things like "we really couldn't talk about [the deal] along the way. . .[w]ell, now I can tell you." However, the APA had been finalized about five months earlier, in July 2023, and there was nothing prohibiting EMBR, Sparks and Cannon from announcing it at that time.

151.     As another example, the Feb. 18 Video repeatedly calls the Badger truck the "Nikola Badger", indicating that Nikola is still directly involved in its development when, in truth, a key purpose of the APA was for Nikola to avoid that connection.

152.     On February 18, 2024, the same day it was published online by Sparks, Milton reposted the Feb. 18 Video on his personal Instagram account (@lakepowelltrevor) with the following text appended to the post:

> 3 years later the truth finally comes out about the **Nikola** Badger. I was framed for a crime I did not commit.  There were a lot of people who wanted to make sure I was convicted to take my voting power away from me.  The truth will finally come out and

> this is just the beginning of the lies becoming exposed.  Click on the link in my bio for the full **Nikola** Badger truth from @heavydsparks

(emphasis added).

153.    Under the text is a link to the M&M Disclaimer Website, the same website hyperlinked in the text below the Feb. 18 Video.

154.    Milton's February 18, 2024 Instagram post also "tagged" Sparks, a social media practice that alerts the tagged user that they have been mentioned in another user's post and effectively creates a link between two social media accounts.

155.    Milton has over 30,000 followers on Instagram.

156.    On February 19, 2024, Milton's LinkedIn account also reposted and linked to the Feb. 18 Video.

157.    The creation and publication of the Feb. 18 Video breached the APA's Excluded Individual Clause, which expressly prohibits Milton from being involved "in any manner, directly or indirectly" or in any way connected with EMBR, EMBR's business or the Purchased Assets, including the Badger trucks.

158.    In addition, in the Feb. 18 Video, Sparks—EMBR's founder and COO—mentions Nikola *over fifty times* and repeatedly refers to the Badger truck as "the Nikola Badger."  Nikola's trademarked name and logo visually appear several times throughout the Feb. 18 Video as well.

159.    The Defendants' improper use of Nikola's trademarks was willful.  Indeed, Cannon has stated in a text message to a Nikola executive that he told Sparks "to block all Nikola marks," but that plainly did not happen.  This statement by Cannon waived the

attorney-client privilege as to advice he gave concerning the video. To the extent Sparks and EMBR ignored that advice, they proceeded willfully.

160. In sharp contrast to the repeated, improper use of the Nikola name and marks, the video mentioned EMBR just *twice*, in back-to-back sentences, in which Sparks discloses that he and Cannon own EMBR. Sparks described EMBR as "the new company that was formed to take delivery of the Nikola Badger and the UTVs and the Waverunners because we were no longer going to use the Nikola name, that did not come with the purchase of the assets."

161. Yet even while conceding that he was not allowed to use the Nikola name, in the very same video, Sparks says "Nikola" so many times that even casual viewers noticed how unusual it was and discussed the issue in the YouTube comments associated with the video. For example:

> @hobbyguy79
> 6 days ago
> In this video...
>
> - Ember mentions = 1
> - Nikola mentions = too many to count
> - Heavy D Stock compensation = yes
> - Reference to past / current stock price = yes
>
> Be very careful here people, this has all the signs of a stock pump!
> Read more
>     137
>
> Reply

162. The suggestion in the post by "hobbyguy79" that Nikola's share price is being manipulated is extremely damaging to Nikola.

Verified Complaint

163. Confusion about the video and the parties' relationship was so pervasive that Sparks had to post a clarification on his Instagram account:



164. As the post quoted above reflects, user "timguy223" did not understand who owned the Badger, and that Sparks knew "there has been a lot of miscommunication and misunderstandings" about it. Notably, Sparks did not even try to remediate the confusion, such as by explaining that EMBR, not Nikola, now owned the rights to the Badger truck project.

165. The Feb. 18 Video's repeated usage of Nikola's name, trademarks and logo without permission is a transparent attempt to capitalize on Nikola's brand recognition and goodwill to further the Defendants' interests, in violation of the APA's Trademark Clauses.

1

2

**P.    EMBR's Website Further Breaches the APA in Furtherance of the Milton Takeover Effort**

166.    On or about February 18, 2024, EMBR's new website was published online, at www.embrmotors.com (the "EMBR Website").  *See* **Exhibit E**.

167.    The EMBR Website mentions "Nikola Motors' founder Trevor Milton facing legal battles…."

168.    The EMBR Website also incorporates by reference a February 18, 2024 TikTok video featuring Sparks entitled "Unveiling the Truth: The Nikola Badger Saga" (the "Feb. 18 TikTok Video").  In the Feb. 18 TikTok Video, apparently an excerpt of the Feb. 18 Video footage, Sparks displays some of the prototypes included in the Purchased Assets, mentions Milton by name, shows a photo of Milton and claims that even though Milton "was getting attacked from every angle, he stood firm on his promise of getting the Badger [truck] built."[22] The same text caption appearing below the Feb. 18 TikTok Video has been copied and pasted on the EMBR Website (or vice versa), further cross-referencing them.

169.    The EMBR Website's references to Milton, both expressly and by reference to the Feb. 18 TikTok Video which discusses Milton at length and even displays his photo, violate the Excluded Individual Clause of the APA.

170.    The EMBR Website also prominently features Nikola's name and logo, as well as registered trademarks belonging to Nikola.

---

[22]    Project Shadow, *Unveiling the Truth: The Nikola Badger Saga,* TikTok (Feb. 18, 2024), https://www.tiktok.com/@project_shadow_us/video/7337135780038511914.

Verified Complaint

171.   For example, under a header "About EMBR Motors" the first sentence says: "Nikola is Back under a new brand…"[23]  This statement is false in multiple ways:  Nikola has not gone anywhere.  It doesn't need to be "back," and it has nothing to with the EMBR "brand."

172.   Exacerbating the deception, a photo of Sparks and Cannon is shown on the EMBR Website in which they are displayed in front of the Nikola name on a truck and Sparks is wearing a hat bearing Nikola's trademarked logo:



173.   The usage of Nikola's trademarked name and logo on the EMBR Website violates the APA's Trademark Clauses and federal trademark law.  It also shows Defendants'

---

[23]   Descriptions of the EMBR Website are as of March 28, 2024.

Verified Complaint

1   lack of concern for EMBR's legal obligations.  As noted, Cannon, in his capacity as a lawyer

2   for EMBR and Sparks, told them to "block all Nikola marks."  Yet at the same time, Cannon

3   is posing for pictures doing exactly the opposite: he is actively participating in infringement

4   of those trademarks.

5   **Q.    The Misleading and Incomplete February 20, 2024 Soliciting Materials**

6   174.   On February 20, 2024, Milton, by and through M&M Residual, caused a

7   Schedule 14A (additional non-management soliciting materials) to be filed with the SEC (the

8   "Feb. 20, 2024 Soliciting Materials"). *See* **Exhibit F**.

9   175.   The Feb. 20, 2024 Soliciting Materials were filed by and on behalf of M&M

10  Residual, Milton, Sparks, Cannon and the other M&M Nominees as a "Group" of "concerned

11  stockholders."

12  176.   Three of the M&M Nominees—Cannon, Johnson and Southam—do not even

13  own any stock in Nikola.  *See* Ex. D at 17.

14  177.   The filing of the Feb. 20, 2024 Soliciting Materials was in furtherance of the

15  aforementioned scheme between Milton, Cannon, Sparks and the Unknown Conspirators to,

16  among other ends, use the publicity surrounding EMBR and the APA to nominate Milton

17  loyalists to Nikola's Board to take control of the company.

18  178.   The Feb. 20, 2024 Soliciting Materials confirm the Defendants' concerted

19  action.   The submission that day states: "The participants in the proxy solicitation are

20  anticipated to be M&M Residual, Trevor R. Milton, Cole Cannon, Derek Johnson, Hans

21  Peterson, Paul Southam, and David Sparks."

179.   The Feb. 20, 2024 Soliciting Materials indicate that defendants have retained Saratoga Proxy Consulting, LLC, a proxy solicitation service provider located in New York, New York, to assist with their proxy campaign.

180.   The Feb. 20, 2024 Soliciting Materials consist of (1) a "press release" announcing the scheme to take over the Nikola Board, (2) the M&M Disclaimer Text, (3) a description of and hyperlink to the Feb. 18 Video of Sparks announcing EMBR's existence and the terms of the APA with Nikola, which it identifies as the "Badger Video," and (4) a purported transcript of the Feb. 18 Video.

181.   Of note, the Feb. 20, 2024 Soliciting Materials tout Sparks' and Cannon's roles as founders of EMBR, calling it a "vehicle manufacturing start-up steeped in EV technology" in an effort to make Sparks and Cannon seem more qualified than they are.

182.   The usage of EMBR's name and business in the Feb. 20, 2024 Soliciting Materials, in conjunction with Milton's name and in furtherance of Milton's interests in taking over the Nikola Board, again violates the APA's Excluded Individual clause.

183.   The publication of the February 20, 2024 Soliciting Materials and the related activities described herein (the "Milton Proxy Contest") are all part of concerted actions by the Defendants.

184.   The Feb. 20, 2024 Soliciting Materials also include many misleading statements and omit material facts.

**R.   The M&M Nominees Are Not "Highly Qualified"**

185.   The Feb. 20, 2024 Soliciting Materials repeatedly describe the M&M Nominees as "highly qualified."

Verified Complaint

186.    The Feb. 20, 2024 Soliciting Materials' descriptions of the M&M Nominees as "highly qualified" are materially false or misleading.

187.    The M&M Nominees are not "highly qualified" to oversee a publicly traded company of Nikola's size and caliber.  For example, in stark contrast to Nikola's current Board, none of the M&M Nominees have prior experience (i) managing a publicly traded company, (ii) in large-scale vehicle manufacturing, (iii) with the engineering and manufacturing of electric or zero-emission vehicles or (iv) developing a network of fueling stations.

188.    To the contrary, some—if not all—of the M&M Nominees are remarkably *unqualified* to oversee a publicly traded, high-tech electric vehicle manufacturer like Nikola.

189.    For example, Nikola is a company with pro-environment goals, including reducing fuel emissions by manufacturing electric heavy-duty vehicles.

190.    Meanwhile, Sparks and Peterson were, until forced to stop by a court's injunction, proponents of "rolling coal," a pollution-glorifying practice that is diametrically opposed to Nikola's entire brand and mission.

191.    Cannon is further unqualified by his behavior as an attorney.  He has participated in conduct that is directly contrary to advice he claims to have given his clients (for example concerning the use of Nikola trademarks).  Moreover, Cannon represents other members of the Group as their attorney.  Cannon thus has various fiduciary, contractual and other duties to members of the Group (*e.g.*, as their attorney) that could interfere or conflict with his duties to Nikola stockholders.

192.   As to the non-Defendant nominees, none is credibly qualified to be the director of a public company specializing in electric heavy-duty vehicles.  Johnson is a former "route manager" at a distributor of alcoholic and soft beverages who now purportedly runs a consulting company.  Peterson works for Sparks and has been a "shop manager" in Sparks' garage.  He also operates a "real estate management and rental company."  Southam runs "a privately held tax strategy company."  None of these nominees has any relevant experience or expertise.

**S.     The M&M Nominees Are Not "Independent"**

193.   The Feb. 20, 2024 Soliciting Materials repeatedly describe the M&M Nominees as "independent."  For example, it represents that the M&M Nominees are "independent director candidates," "wholly independent and focused on one goal," and an "independent slate."

194.   The Feb. 20, 2024 Soliciting Materials' description of the M&M Nominees as being "independent" is materially false or misleading.

195.   The M&M Nominees are not independent from each other, are not independent from Milton, and are not free from the influence, direction or control of Milton, Sparks and Cannon.

196.   To the contrary, upon information and belief, each of the M&M Nominees are close personal friends of Milton, Cannon and/or Sparks.

197.   Upon information and belief, the primary reason the M&M Nominees were selected and nominated was that they would be loyal to Milton and would vote in furtherance of his interests at meetings of the Board—not the interests of Nikola's other stockholders.

**T.      The Feb. 20, 2024 Soliciting Materials Omit Adverse Material Information About the M&M Nominees**

198.     The Feb. 20, 2024 Soliciting Materials fail to disclose many material facts about Milton, M&M and the M&M Nominees (the "Group").

199.     With respect to the entire Group, the Feb. 20, 2024 Soliciting Materials fail to disclose their prior relationships with each other and lack of independence and impartiality, as detailed in this Complaint.

200.     With respect to Milton, the Feb. 20, 2024 Soliciting Materials omit, among other things (i) any objective disclosure of Milton's recent felony conviction for defrauding investors, (ii) any disclosure of the many other lawsuits Milton is currently defending against, including multiple lawsuits involving Nikola, and (iii) the $165 million Arbitration Award that Milton is refusing to pay to Nikola.

201.     With respect to Sparks, the Feb. 20, 2024 Soliciting Materials omit, among other things, (i) disclosure of his current financial situation, which is so dire that he cannot even pay the judgment in the Rolling Coal Lawsuit and has IRS liens, (ii) disclosure of the fact that Sparks' other businesses have failed or generate no profit, and (iii) disclosure of the multiple lawsuits in which Sparks and his companies are embroiled, including the Rolling Coal Lawsuit.

202.     With respect to Cannon, they omit (i) disclosure of his prior relationships with the other members of the Group and (ii) disclosure of the fiduciary, contractual and other legal duties he owes to the other members of the Group (*e.g.*, as their attorney) that could interfere or conflict with his duties to Nikola stockholders if named to the Board.

203.    With respect to Derek Johnson, they omit that Mr. Johnson is so close to Milton that he flew to New York to support Milton during his criminal proceedings and submitted a letter in support of Milton during his sentencing.

204.    With respect to all of the M&M Nominees, the Feb. 20, 2024 Soliciting Materials fail to disclose the understanding, agreement and/or arrangement that they would be loyal to Milton and act on his behalf and in furtherance of his interests if they became Board members.

205.    The Feb. 20, 2024 Soliciting Materials, the EMBR Website and the Feb. 18 Video featuring Sparks each confirm that on or before February 18, 2024, the Defendants willfully and knowingly conspired and agreed among themselves to use EMBR, EMBR's acquisition of assets from Nikola, the Badger truck project, and Nikola's trade name, trademarks and logo in furtherance of their own unlawful interests.

206.    And that's not all.  The Feb. 20, 2024 Soliciting Materials represented that, as of February 20, 2024, M&M Residual held approximately 51 million Nikola shares for the benefit of Milton.   Shortly after disseminating the Feb. 20, 2024 Soliciting Materials, Milton—who, upon information and belief, had not purchased or sold any Nikola stock since August 2022—began moving shares from M&M Residual to at least 14 other entities and/or custodial accounts within his control.  By March 20, 2024, M&M Residual held only about 4 million Nikola shares, far less than the 51 million shares that Milton and M&M Residual claimed in the Feb. 20, 2024 Soliciting Materials.  Upon information and belief, Milton has transferred these assets in furtherance of his scheme to frustrate Nikola's efforts to collect the $165 million Arbitration Award against him.

207.   The Feb. 20, 2024 Soliciting Materials are also false and misleading because they attribute the significant drop in the value of Nikola's stock after September 2020 to Nikola's current management, even though the significant stock price decreases in and after September 2020 were a consequence of the September 10, 2022 Hindenburg Report concerning Milton and the investigations, lawsuits and negative publicity that followed.

**U.    The M&M Disclaimer Website Also Contains Misleading Information**

208.   Additional false and misleading proxy solicitation materials are posted online beyond the Feb. 20, 2024 Soliciting Materials and the Feb. 18 Video.

209.   For example, the M&M Disclaimer Website hyperlinked in the Feb. 18 Video says: "*As of the date hereof*, M&M Residual directly owns 51,047,726 shares of [Nikola] common stock…." (emphasis added).   No date is reflected in the text or elsewhere on the M&M Disclaimer Website.   Therefore, "as of the date hereof" is the date the viewer accesses the website.   M&M Residual does not presently own 51,047,726 shares of Nikola stock and in fact is believed to now own significantly less.   Therefore, any viewer accessing the M&M Disclaimer Website now, or at any time after Milton and M&M Residual began selling or transferring millions of shares of stock, may be materially misled about the amount of stock currently held by M&M Residual and Milton.

**V.    The Defendants Continue to Irreparably Harm Nikola**

210.   The unlawful acts and omissions of the Defendants have caused Nikola to suffer irreparable harm and injury.

211.   Since Milton's departure in 2020, Nikola has been trying to publicly distance itself from Milton and regain the investor and consumer confidence that Milton's misconduct effectively destroyed.

212.   Up until the recent acts of the Defendants, those efforts have been relatively successful.[24]

213.   Indeed, one of Nikola's main goals in entering into the APA was to further divorce itself from Milton by selling assets which had been publicly associated with Milton and his fraud (*e.g.*, the Badger truck), and terminating the Development Agreement with Sparks, an agreement that Milton caused Nikola to enter into right before his departure.

214.   However, Defendants' unlawful acts and omissions have caused Nikola to be *even more* publicly entwined with Milton, a convicted felon.

215.   Nikola has suffered significant negative publicity, harm to its reputation and loss of goodwill caused by these Defendants.

216.   For example, on February 20, 2024, an online media outlet called Elektrek.com posted a disparaging article entitled "Nikola Badger electric pickup makes a comeback in the most hilarious way" in which the author recounts the Feb. 18 Video and Nikola's history with

---

[24] *See, e.g.,* "Nikola," Car and Driver,  https://www.caranddriver.com/nikola  (describing Nikola as a company that has "distanced itself from its estranged founder, canceling the Badger and returning its attention to commercial vehicles" but which "fights an uphill battle to overcome the fallout of Milton's deceit….").

Verified Complaint

Milton and claims that it "gave [him] a good laugh today."[25]   In the article, including in its title, the Badger truck is referred to as the "Nikola Badger"—just as Sparks did throughout the Feb. 18 Video.

217.   As another example, the Defendants' unlawful use of Nikola's name and trademarks has already caused significant confusion among consumers and the public about Nikola's relationship to EMBR and the Purchased Assets.

218.   The confusion is evident in the comments below the Feb. 18 Video posted on YouTube and Instagram.   For example, one YouTube user (@Zoniebaer) posted a comment below the Feb. 18 Video asking: "Is this going to be 'EMBR' or 'Nikola' Badger?"   Another user (@mleon602) thought Sparks was advertising for Nikola, commenting "love the sales pitch. How much did you make from nikola?"   A third user (@arymu007) asked: "Will the Badger fall under a new manufacture label or the Nikola brand?"   And on Instagram, a fourth user (@timguy223) commented: "I don't understand the badger itself or nikola?"

**COUNT I**
**Breach of Contract**
**(Against Defendant EMBR)**

219.   Nikola incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully stated herein.

220.   Nikola and EMBR entered into the APA on or about July 21, 2023.

---

[25]  Fred Lambert, *Nikola Badger Electric Pickup Makes a Comeback in the Most Hilarious Way*, Electrek (Feb. 20, 2024), https://electrek.co/2024/02/20/nikola-badger-electric-pickup-comeback/.

221.   In the APA, EMBR agreed to have no dealings or connection with Milton whatsoever during the Restricted Period.

222.   EMBR also agreed, in the APA, that Milton could not be "connected in any manner with [EMBR] or the Purchased Assets" during the Restricted Period.

223.   The Restricted Period was defined as "a period from the Closing until at least twelve months after the date that neither Seller nor any of its Affiliates has any equity or debt interest in the Purchaser."  Ex. A § 5.5.

224.   The closing occurred on or around July 21, 2023.

225.   Nikola continues to have an equity and debt interest in EMBR, therefore the Excluded Individual Clause remains operative and binding on EMBR.  Nikola has performed its obligations under the APA.

226.   EMBR has breached the APA by collaborating, directly or indirectly, with Milton with respect to the Milton Proxy Contest and otherwise as described herein.

227.   EMBR has breached the APA by allowing its company name, as well as the Purchased Assets and the "Badger" truck name, to be utilized by and in connection with Milton.

228.   In the APA, EMBR also agreed, repeatedly, not to use any trade name or trademark belonging to Nikola.

229.   EMBR has breached the APA by repeatedly using Nikola's name, trademarks and logo without permission in public-facing communications intended to promote and draw attention to the interests of Defendants.

230.    EMBR's breach of the APA has caused, and unless enjoined will continue to cause, irreparable harm and injury to Nikola for which there is no adequate remedy at law.

231.    As a result of EMBR's breach of the APA, Nikola is entitled to recover attorneys' fees and costs, including pursuant to A.R.S. §§ 12-341.01 and 12-341 or other applicable law.

## COUNT II
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Against EMBR)

232.    Nikola incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully stated herein.

233.    Arizona law implies a covenant of good faith and fair dealing in every contract which prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement.  It likewise prohibits a party from acting in ways not expressly excluded by the contract terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain.

234.    Under Arizona law, a breach of the duty of good faith and fair dealing is both a breach of contract and a tortious act.

235.    As part of the APA, EMBR owed and owes Nikola a duty of good faith and fair dealing.

236.    To the extent its acts and omissions were not expressly prohibited by the APA's terms, EMBR has acted in ways which bear adversely on Nikola's reasonably expected benefits of the bargain.

237.   For example, in entering the APA, Nikola reasonably expected (i) that the founders of EMBR, Cannon and Sparks, were not consulting with or being advised by Milton, (ii) that its sale of the Purchased Assets to EMBR would not be used to publicly launch a scheme, involving Milton, to take over the Nikola Board, (iii) that EMBR would not allow the APA and Purchased Assets to be used by Milton to further his own interests, and (iv) that EMBR would not allow the other Defendants to use Nikola's trade name, logo and brand recognition to further their own, personal interests.

238.   The actions of EMBR and its agents, as described herein, have destroyed Nikola's ability to receive the benefit of the bargain under the APA.

239.   EMBR's breach of the covenant of good faith and fair dealing in the APA has caused, and unless enjoined will continue to cause, irreparable harm and injury to Nikola for which there is no adequate remedy at law.

**COUNT III**
**Aiding and Abetting EMBR's Breach of the Implied**
**Covenant of Good Faith and Fair Dealing**
**(Against M&M Residual and Milton)**

240.   Nikola incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully stated herein.

241.   As alleged in Count II, EMBR breached the implied covenant of good faith and fair dealing owed to Nikola.  This was both a breach of contract and a tortious act.

242.   Milton and M&M Residual knew that the APA's Excluded Individual Clause strictly forbade Milton from being in any way involved with the Badger project, and EMBR generally.

Verified Complaint

243.     Milton and M&M Residual knew that their underhanded efforts to avoid that prohibition would substantially assist or encourage EMBR to breach its implied covenant of good faith and fair dealing with Nikola.

244.     Absent this duplicitous conduct by Defendants Milton and M&M Residual, EMBR would not have breached the implied covenant of good faith and fair dealing owed to Nikola under the APA with respect to Milton.

245.     Defendants Milton and M&M Residual aided and abetted EMBR's breach of the implied covenant of good faith and fair dealing.

246.     As a result of Milton and M&M Residual aiding and abetting EMBR's breach of the covenant of good faith and fair dealing, Milton and M&M Residual have caused, and unless enjoined will continue to cause, irreparable harm and injury to Nikola for which there is no adequate remedy at law.

**COUNT IV**
**Aiding and Abetting EMBR's Breach of the Implied**
**Covenant of Good Faith and Fair Dealing**
**(Against Sparks and Cannon)**

247.     Nikola incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully stated herein.

248.     As alleged in Count II, EMBR breached the implied covenant of good faith and fair dealing owed to Nikola.  This was both a breach of contract and a tortious act.

249.     Sparks and Cannon knew that the APA's Excluded Individual Clause strictly forbade Milton from being in any way involved with the Badger project, and EMBR generally.

- 53 -
Verified Complaint

250. Sparks and Cannon knew that their underhanded efforts to avoid that prohibition would substantially assist or encourage EMBR to breach its implied covenant of good faith and fair dealing with Nikola.

251. Absent this duplicitous conduct by Defendants Sparks and Cannon, EMBR would not have breached the implied covenant of good faith and fair dealing owed to Nikola under the APA with respect to Milton.

252. Defendants Sparks and Cannon aided and abetted EMBR's breach of the implied covenant of good faith and fair dealing.

253. In aiding and abetting EMBR's breach of the APA's implied covenant of good faith and fair dealing, Sparks and Cannon were not acting for the benefit of EMBR. There is no reasonable circumstance under which EMBR would benefit from incurring liability for breaching the APA, which prohibits dealing with Milton.

254. As a result of Sparks and Cannon aiding and abetting EMBR's breach of the covenant of good faith and fair dealing, Sparks and Cannon have caused, and unless enjoined will continue to cause, irreparable harm and injury to Nikola for which there is no adequate remedy at law.

**COUNT V**
**Tortious Interference with Contract**
**(Against M&M Residual and Milton)**

255. Nikola incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully stated herein.

256. The APA is a valid contractual relationship between Nikola and EMBR.

257. Defendants Milton and M&M Residual knew about the APA between Nikola and EMBR.

258. Notwithstanding such knowledge, Defendants Milton and M&M Residual intentionally interfered with Nikola's relationship with EMBR by, among other actions alleged in this Complaint, causing or inducing EMBR to breach the APA.

259. Defendants Milton and M&M Residual's actions alleged herein have caused EMBR to breach the APA, which has in turn caused injury to Nikola.

260. The foregoing tortious interference with the APA has caused, and unless enjoined will continue to cause, irreparable harm and injury to Nikola for which there is no adequate remedy at law.

**COUNT VI**
**Violations of the Lanham Act, 15 U.S.C. §§ 1051 *et seq*.**
**(Against EMBR, Sparks and Cannon)**

261. Nikola incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully stated herein.

262. Nikola has used the name "Nikola" to market and sell its goods and services since it was founded.  Accordingly, consumers, investors and the public associate the name "Nikola" with Nikola's goods and services.

263. Nikola uses the Internet to market and sell its goods and services online.  For example, Nikola has a website, https://www.nikolamotor.com/, and regularly uses social media accounts on Instagram, YouTube, LinkedIn, Facebook and X to communicate with potential customers, investors and the general public.

264.   Nikola has numerous trademarks registered with the United States Patent and Trademark Office.  Nikola's registered trademarks related to motor vehicles include the trade name "NIKOLA" (U.S Reg. No. 6547863) and the trademarked "N" image below (U.S. Reg. No. 6570309):



collectively, (the "Nikola Marks").  Both Nikola Marks have been so registered since at least 2021.  *See* **Exhibit G**.

265.   Defendants had at least constructive, if not actual, notice of Nikola's rights in and to the Nikola Marks.

266.   Both Nikola and EMBR are companies involved in developing and marketing zero-emission motor vehicles.

267.   Without authorization, Defendants have used the Nikola Marks to market and draw public attention to EMBR, a new company with zero brand recognition, and to further the financial interests of themselves and their longtime friend, Trevor Milton.

268.   Defendants' use of the Nikola Marks, including in the Feb. 18 Video and on EMBR's website, are likely to cause confusion, mistake, and deception by creating the false and misleading impression that EMBR is a "brand" or subsidiary of Nikola or that EMBR is somehow sponsored or endorsed by Nikola.

Verified Complaint

269.   EMBR is not a "brand" or subsidiary of Nikola.  EMBR is also not sponsored or endorsed by Nikola.  Nikola and EMBR two entirely separate companies with separate management, goals and business strategies.

270.   Defendants' actions described above are likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of Defendants, Defendants' services, and/or Defendants' commercial activities and thus constitute trademark infringement, false designation of origin, and unfair competition in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

271.   Defendants' infringing use of the registered Nikola Marks is likely to cause consumer confusion, mistake, or to deceive, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

272.   Indeed, the Defendants' use of Nikola's trademarks and logo on their materials, including the Feb. 18 Video, the EMBR Website and other communications has *already* caused substantial confusion. For example, a number of comments on social media indicate that the Feb. 18 Video has caused confusion about Nikola's involvement with EMBR and the Purchased Assets.

273.   The Defendants' unauthorized use of Nikola's trade name, trademarks and logo has caused or is likely to cause harm to Nikola's commercial interests.

274.   The Defendants' unauthorized use of the Nikola Marks has caused and will continue to cause irreparable injury to Nikola, including injury to its business reputation and the good will associated with Nikola.

275.    The Defendants' unauthorized use of the Nikola Marks was intentional, willful, and malicious.  Defendants have intentionally traded on the goodwill, reputation and brand recognition associated with the Nikola Marks to Nikola's detriment.

276.    For example, in the Feb. 18 Video, Sparks admits that neither he nor EMBR are authorized to use Nikola's name or trademark, but then proceeds to use Nikola's name *over fifty times*, including in the video's title.  Likewise, Cannon claims he instructed Sparks not to use Nikola marks but Cannon took no steps to prevent such use or remediate it when it occurred.

277.    Sparks, the co-founder of EMBR and COO who is featured in the Feb. 18 Video, also has an established pattern and practice of flagrantly infringing upon others' intellectual property rights.

278.    As a result of the Defendants' trademark infringement described herein, Nikola is entitled to injunctive relief, compensatory damages, punitive damages and attorneys' fees and costs.

**COUNT VII**
**Contributory Trademark Infringement**
**(Against Milton, M&M Residual, Sparks and Cannon)**

279.    Nikola incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully stated herein.

Verified Complaint

280.   Milton, M&M Residual, Sparks and Cannon had actual or constructive knowledge of Nikola's rights in and to the Nikola Marks.[26]

281.   Milton, M&M Residual, Sparks and Cannon had actual or constructive knowledge that the use of the Nikola Marks, such as within the Feb. 18 Video and on EMBR's website, constituted trademark infringement.

282.   Milton, M&M Residual, Sparks and Cannon intentionally induced EMBR to violate Nikola's intellectual property rights and infringe upon Nikola's trademarks.

283.   Milton & M&M Residual also contributed to and encouraged the trademark infringement described herein by, among other things, reposting and hyperlinking the Feb. 18 Video on Milton's Instagram and LinkedIn social media accounts and including a transcript of the Feb. 18 Video in the Feb. 20, 2024 Solicitation Materials.

284.   Milton, M&M Residual, Sparks and Cannon have been, and continue to be aware of and contributing to, the infringement and unauthorized use of the Nikola Marks.

285.   Alternatively, Milton, M&M Residual, Sparks and Cannon have been (and continue to be) willfully blind to the infringement of the Nikola Marks.

286.   As a proximate result of Milton's, M&M Residual's, Sparks' and Cannon's contributory infringement, Nikola has been irreparably harmed and injured and is entitled to injunctive relief, compensatory damages, punitive damages and attorneys' fees and costs.

---

[26]   This claim is alleged in the alternative as to Sparks and Cannon, to the extent that they are not found liable for direct trademark infringement.

Verified Complaint

## COUNT VIII
### Unfair Competition under Arizona Common Law
### (Against All Defendants)

287.   Nikola incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully stated herein.

288.   The acts of Defendants described herein, including their unauthorized use of the Nikola Marks and/or Nikola's trade name, trademarks and logo, were undertaken to gain an unfair competitive advantage and further their own financial interests.

289.   For example, Defendants' use of Nikola Marks and/or Nikola's trade name, trademarks and logo to promote an inferior new business, EMBR, was an unfair business practice that harmed Nikola's brand and unfairly capitalized on the goodwill and brand name recognition associated with Nikola.

290.   The Defendants' unauthorized use of Nikola's trade name, trademarks and logo is and was likely to confuse, deceive or mislead viewers or the general public.

291.   In fact, the Defendants' use of Nikola's trade name, trademarks and logo on their materials and communications did cause confusion.

292.   The Defendants' unauthorized use of Nikola's trade name, trademarks and logo has caused or is likely to cause harm to Nikola's commercial interests.

293.   The Defendants' unauthorized use of Nikola's trade name, trademarks and logo was intentional, willful and malicious.

294.   As a result of the Defendants' unlawful acts described herein, Nikola is entitled to injunctive relief, compensatory damages, punitive damages and attorneys' fees and costs.

Verified Complaint

**COUNT IX**
**Claims for Violations of the Securities Exchange Act, Section 14(a) and Rule 14a-9(a)**
**(Against all Defendants)**

295.    Nikola incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully stated herein.

296.    Defendants M&M Residual, Milton, Sparks and Cannon jointly filed the Feb. 20, 2024 Soliciting Materials as members of a "Group," along the other M&M Nominees.

297.    In addition to the Feb. 20, 2024 Soliciting Materials, the Defendants, including EMBR, have also caused the publication of or otherwise publicly disseminated other proxy solicitation materials including a February 20, 2024 press release, the M&M Disclaimer Text, the material on the M&M Disclaimer Website and the Feb. 18 Video (collectively, the "Proxy Solicitation Materials").

298.    The Proxy Solicitation Materials were all published, posted or publicly disseminated in furtherance of the Defendants' scheme to further their own interests and help Milton take over Nikola's Board.

299.    The Defendants had a duty to provide truthful disclosures in connection with their Proxy Solicitation Materials.

300.    The Defendants had a duty not to omit material information from their Proxy Solicitation Materials.

301.    The Defendants knew their statements were false and misleading at the time they were made and/or knew that material information was omitted.

302.    Alternatively, and at a minimum, the Defendants were negligent or reckless in making their materially false and misleading statements and omissions.

303.   The Defendants' false and misleading statements and omissions were material because a reasonable shareholder would have considered them important in deciding how to vote in connection with the proxy contest.  In other words, a reasonable investor would have viewed the false and/or misleading statements and omissions in Defendants' disclosures as significantly altering the total mix of information available.

304.   The Defendants' false and misleading Proxy Solicitation Materials have damaged and continue to damage Nikola, including by causing Nikola's stockholders to have false and negative impressions of Nikola and its business as well as false impressions concerning the M&M Nominees and their qualifications to serve on the Board.

305.   If allowed to continue, and if not publicly corrected, Defendants' materially misleading statements and omissions in their Proxy Solicitation Materials and other anticipated future publications will deprive Nikola's stockholders of the ability to make fully informed decisions on the future of Nikola based on the full and accurate information to which they are entitled, constituting clear and irreparable harm.

306.   Upon information and belief, the Defendants intend to continue their campaign of misinformation in connection with their efforts to seize control of Nikola' Board.

307.   Nikola and its stockholders will be irreparably injured if Defendants continue to make materially false and misleading statements to Nikola's stockholders in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

308.   Nikola has no adequate remedy at law.

309.   The Proxy Solicitation Materials also violate Nikola's Amended and Restated Bylaws, attached as **Exhibit H**, (the "Bylaws"), which expressly require compliance with the

Verified Complaint

Exchange Act and the rules and regulations promulgated thereunder.  *See* Ex. H § 3.2(d). Under Section 3.2(d) of the Bylaws, if a nominating stockholder fails to comply with any applicable requirement of the Exchange Act or the rules and regulations promulgated thereunder, such stockholder's nominees will be disqualified from standing for election as Nikola directors.

310.    As a result of Defendants' violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, Nikola is entitled to (i) a declaration that by publishing, posting or publicly disseminating the Proxy Solicitation Materials, M&M Residual violated the Bylaws, (ii) a declaration the M&M Nominees are disqualified from standing for election as Nikola directors at the 2024 annual meeting pursuant to Section 3.2(d) of the Bylaws, (iii) injunctive relief enjoining Defendants from any future violations of the Exchange Act, the rules and regulations promulgated thereunder or Section 3.2 of the Bylaws, and (iv) actual damages, attorneys' fees and costs.

### COUNT X
### Civil Conspiracy
### (Against M&M Residual, Milton, Sparks and Cannon)

311.    Nikola incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully stated herein.

312.    Defendants Sparks, Cannon, Milton, M&M Residual and the Unknown Conspirators (collectively, the "Conspiracy Defendants") maliciously, willfully and unlawfully conspired to commit tortious acts including: (i) participating in the Milton Proxy Contest, (ii) providing materially false and misleading information to the public as part of the

Verified Complaint

Milton Proxy Contest, (iii) inducing EMBR to breach the implied covenant of good faith and fair dealing it owed to Nikola, (iv) tortiously interfering in the contractual relationship between EMBR and Nikola, and (v) engaging in unfair competition in violation of Arizona law.

313.   Upon information and belief, each of the Conspiracy Defendants is and was acting with the knowledge, consent and permission of, and in conspiracy with, each and all of the Conspiracy Defendants.

314.   Upon information and belief, the actions, failures to act, breaches, conspiracy, concealment and misrepresentations alleged herein and attributed to one or more of the specific Conspiracy Defendants were approved, ratified and done with the cooperation and knowledge of each and all of the Conspiracy Defendants.

315.   As a direct and proximate cause of this conspiracy, Nikola has suffered and will continue to suffer irreparable harm and injury for which there is no adequate remedy at law.

316.   As a result of this conspiracy and unlawful acts, each of the Conspiracy Defendants are equally subject to all liability arising from their combined conduct and arising from each and every act or omission done in furtherance thereof, including without limitation for the damage and harm set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Nikola prays that this Court enter judgment against Defendants and in its favor by:

A.      Entering a judgment in favor of Nikola against Defendants on all counts in the Complaint;

Verified Complaint

B.     Awarding Nikola preliminary and permanent injunctive relief preventing Defendants from continuing the Milton Proxy Contest in breach of their obligations and duties under the contract and state and federal law, including, without limitation,

- Barring Milton from making any reference to EMBR, Sparks, or Cannon in any subsequent statements relating to the February 20, 2024 Soliciting Materials or any subsequent proxy solicitation;

- Barring Sparks and Cannon from being nominated as directors in the proxy or participating in the proxy in any other way; and

- Declaring that the Proxy Solicitation Materials are false and misleading;

C.     Declaring that, as a consequence of EMBR's material breach of the APA, the APA is deemed terminated and is hereby terminated with the parties thereto to take all steps necessary to promptly fulfill their obligations following termination;

D.     Declaring that (i) by publishing, posting or publicly disseminating the Proxy Solicitation Materials, M&M Residual violated the Bylaws because such materials fail to comply with Section 14(a) of the Exchange Act and SEC Rule 14a-9, and (ii) accordingly, the M&M Nominees are disqualified from standing for election as Nikola directors at the 2024 annual meeting pursuant to Section 3.2(d) of the Bylaws.

E.     Declaring that the Defendants' Proxy Solicitation Materials violate Nikola's Amended and Restated Bylaws because they fail to comply with the Exchange Act and SEC Rule 14a-9;

F.     Ordering Defendants to issue public disclosures correcting their materially false and misleading proxy solicitations and other statements made in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder;

Verified Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

G.      Awarding Nikola preliminary and permanent injunctive relief as to all Defendants from engaging in conduct that violates the Exchange Act, the rules and regulations promulgated thereunder, and/or Section 3.2 of the Bylaws;

H.      Awarding Nikola preliminary and permanent injunctive relief as to all Defendants prohibiting them from: (i) all continued and future use, copying, distribution, publication, development or deployment of Nikola's trade name(s) and trademarks; (ii) representing, in any manner or method, that any goods, services or business sold by Defendants are sponsored, approved, or authorized by or originating from Nikola, or from taking any action likely to cause confusion, mistake, or deception as to the nature, characteristics, approval, sponsorship or certification of those goods or services; and (iii) using Nikola's trade dress, trademarks, or any false or misleading description of fact or representation of fact, or otherwise making any statement in commercial advertising or promotion which misrepresents the nature, characteristics, or qualities of Defendants' goods or services or Nikola's involvement with those goods or services;

I.      Awarding Nikola preliminary and permanent injunctive relief as to EMBR and its officers and all others acting in concert with them from mentioning, whether express or implied, Milton, M&M Residual and any of its officers, directors, affiliates and agents in any public-facing communications;

J.      Awarding Nikola preliminary and permanent injunctive relief requiring Defendants to immediately remove all existing public-facing references to Nikola on the EMBR website and any social media accounts controlled by the Defendants (including but not limited to YouTube, Facebook, Instagram, TikTok, LinkedIn and X);

1    K.    Awarding Nikola punitive damages;

2    L.    Awarding Nikola its attorneys' fees and costs, including attorneys' fees and

3    costs recoverable pursuant to A.R.S. §§ 12-341.01 and 12-341 or other applicable law; and

4

5    M.    Granting any further relief as the Court considers just and proper.

6

7    DATED: March 28, 2024

8                                          HOFFMAN LEGAL, LLLC

9

10                                         By   /s/ Amy Wilkins Hoffman
                                           Amy Wilkins Hoffman (SBN 022762)
11                                         99 E. Virginia Ave., Ste. 220
                                           Phoenix, AZ 85004
12                                         Phone: (623) 565-8851
                                           Email: ahoffman@hoffmanlegalaz.com
13
                                           BAUGHMAN KROUP BOSSE PLLC
14

15                                         John F. Baughman, *pro hac vice (pending)*
                                           Adam Offenhartz*, pro hac vice (pending)*
16                                         One Liberty Plaza –46th Floor
                                           New York, NY 10006
17                                         Phone: (212) 548-3212
                                           Email:  jbaughman@bkbfirm.com
18                                         Email: aoffenhartz@bkbfirm.com

19                                         Allison Melton*, pro hac vice (pending)*
20                                         500 E. Main Street, Suite 1400
                                           Norfolk, VA 23510
21                                         Phone: (757) 266-5585
                                           Email: amelton@bkbfirm.com
22

23                                         *Attorneys for Nikola Corporation*

24

25

26

27

28
                                    - 67 -
                                Verified Complaint

## **VERIFICATION**

I, the undersigned, have read the foregoing Complaint and know its contents.

I am Chief Legal Officer of Nikola Corporation, the plaintiff in this action, and am authorized to make this verification on its behalf.

I certify under penalty of perjury that the allegations in the Complaint are true and correct to the best of my knowledge, information and belief.

Dated: March 28, 2024

_____
Britton Worthen